Marianne Dugan, OSB # 932563
1430 Willamette St. # 359
Eugene, OR 94701
(541) 338-7072
Fax (866) 650-5213
mdugan@mdugan.com

       Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| CHRISTINE DAUGHERTY, | No. 6:19-cv-00897-MK |
| Plaintiff, | PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | ORAL ARGUMENT REQUESTED |
| DESCHUTES COUNTY, | |
| Defendant. | |

Plaintiff hereby responds to defendant's motion for summary judgment and asks that the court reject the motion.

**STANDARD FOR SUMMARY JUDGMENT**

A.    **Generally**

The Court should grant summary judgment only if the movant demonstrates there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Oregon Natural Resources Council v. Marsh, 845 F. Supp. 758, 764 (D. Or. 1994).  Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of a dispute.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

All reasonable doubts as to the existence of genuine issues of material fact must be resolved against the moving party, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987).

B.    **Employment Cases**

A plaintiff alleging employment discrimination "need produce very little evidence in order to overcome an employer's motion for summary judgment.  This is because the ultimate question is one that can only be resolved through a searching inquiry -- one that is most appropriately conducted by a factfinder, upon a full record."  Chuang v. Univ. of Cal. Davis, 225 F.3d 1115, 1124 (9th Cir. 2000) (internal quotation marks omitted).  "In evaluating motions for summary judgment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to

evaluate the credibility of the witnesses." <u>McGinest v. GTE Serv. Corp.</u>, 360 F.3d 1103, 1112 (9th Cir. 2004).

The Ninth Circuit has noted that the evidence of discriminatory animus will almost always be circumstantial, because "[d]efendants who articulate a nondiscriminatory explanation for a challenged employment decision may have been careful to construct an explanation that is not contradicted by known direct evidence." <u>Cornwell v. Electra Cent. Credit Union</u>, 439 F.3d 1018, 1028 (9th Cir. 2006) (quoting <u>Texas Dep't of Cmty. Affairs</u>, 450 U.S. at 256).  Indeed, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." <u>Rogers v. Missouri Pacific R. Co.</u>, 352 U.S. 500, 508 n.17 (1957).

> Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available.  Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action. . . . Moreover, [q]uestions involving a person's state of mind ... are generally factual issues inappropriate for resolution by summary judgment." <u>Braxton-Secret v. Robins Co.</u>, 769 F.2d 528, 531 (9th Cir. 1985).

<u>Mendocino Environmental Center v. Mendocino County</u>, 192 F.3d 1283, 1302 (9th Cir. 1999).

### C.    Examples of Circumstantial Evidence Which Defeats Summary Judgment

The courts have held several types of circumstantial evidence will permit an inference of retaliation sufficient to deny summary judgment.

**Proximity in time and the chronology of events** – especially a period of satisfactory relationships with the defendant that deteriorates after the plaintiff has undertaken protected activity.  "[P]roximity in time between the protected action and the allegedly retaliatory employment decision [i]s one [way] a jury logically could infer [that the plaintiff] was terminated in retaliation." <u>Keyser v. Sacramento City Unified Sch. Dist.</u>, 265 F.3d 741, 751-52 (9th Cir. 2001).  In some cases, temporal proximity can by itself constitute sufficient

circumstantial evidence of retaliation for purposes of both the prima facie case and the showing of pretext.  See Bell v. Clackamas County, 341 F.3d 858, 865-66 (9th Cir. 2003) (temporal proximity provides circumstantial evidence, as does the negative change in evaluations over time); Miller v. Fairchild Indus., Inc., 797 F.2d 727, 731-32 (9th Cir. 1986); Schwartzman v. Valenzuela, 846 F.2d 1209, 1212 (9th Cir. 1988) (plaintiff employee had received good evaluations until he began criticizing his employer's procedures publicly); Winarto v. Toshiba Am. Elecs Components, Inc., 274 F.3d 1276, 1287 n.10 (9th Cir. 2001) (plaintiff's complaints, which closely preceded reduction in her performance review scores and a labeling of her as not a "team player," supported a reasonable inference that defendant acted with a retaliatory motive); Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (sufficient evidence of causation existed where adverse actions occurred less than three months after complaint was filed, two weeks after charge first investigated, and less than two months after investigation ended); Stegall v. Citadel Broadcasting, 350 F.3d 1061 (9th Cir. 2003); Hernandez v. Spacelabs, 343 F.3d 1107 (9th Cir. 2003).

**Shifting explanations offered for the allegedly retaliatory acts.**  See, e.g., Hernandez v. Hughes Missile Systems Co., 362 F.3d 564, 569 n. 3 (9th Cir. 2004) (falsity of explanation is circumstantial evidence; purported unwritten policy not mentioned until lawsuit; no one at company could identify origin of alleged policy; conflicting reasons given at different times; specific written policies conflict with alleged unwritten policy); Payne v. Norwest Corp., 113 F.3d 1079 (9th Cir. 1997).  See also Miller-El v. Dretke, 545 U.S. 231 (2005) (observing, in case involving discriminatory peremptory challenges, that "[i]t would be difficult to credit the State's new explanation, which reeks of afterthought.").

**Statements of hostility or ill-will towards the plaintiff.** Gilbrook v. City of Westminster, 177 F.3d 839, 857 (9th Cir. 1999); Bell, 341 F.3d 858 (mean looks); Winarto, 274 F.3d at 1287 n.10 ("exasperation," "lack of sympathy" as circumstantial evidence); Porter v. Calif. Dept of Corrections, 419 F.3d 885 (9th Cir. 2005) ("not for you" sneers; spitting in food; glaring); Fonseca v. Sysco Food Services of Arizona, Inc., 374 F.3d 840 (9th Cir. 2004) (e.g. mocking of accents); Chuang, 225 F.3d 1115; Ettner v. City of Medford, 155 Or. App. 435, 963 P2d 149, rev. denied, 328 Or. 40, 977 P.2d 1170 (1998) (evidence of animus towards women due to statements male firefighter coworkers made).

**Evidence that a defendant failed to exercise independent judgment.** Gilbrook, 177 F.3d at 857.

**Deviation from policy.** Porter, 419 F.3d 885 (deviation, including coworker's suspicion of harassment before plaintiff even complained is evidence of pretext); Giacoletto v. Amax Zinc Co., 954 F.2d 424, 427 (7th Cir. 1992) ("The jury could reasonably have concluded that because Amax neglected to follow [its] procedures for helping employees to overcome their deficiencies, the company had fired Giacoletto not because of his asserted deficiencies, but to retaliate [against him]"); Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1220 (10th Cir. 2002) (holding that deviations from an employer's regular procedures established pretext); Russell v. TG Mo. Corp., 340 F.3d 735, 746 (8th Cir. 2003) ("We agree . . . that an employer's deviation from its own policies can, in some instances, provide evidence of pretext"); Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1108 (11th Cir. 2001) ("An employer's violation of its own normal hiring procedure [was] evidence of pretext"); Stern v. Trs. of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997) (reiterating that an employer's departure from regular procedures can be indicative of pretext).

C.    **"Adverse Employment Action" Defined**

A variety of events can constitute "adverse employment actions."  See e.g., Manatt v. Bank of America, NA, 339 F.3d 792, 802 (9th Cir. 2003) (denial of transfer is adverse employment decision); Passantino v. Johnson & Johnson Consumer Products, Inc., 212 F.3d 493, 500-01, 506 (9th Cir. 2000) (low rating on job performance review, decreased job responsibilities, and failure to receive promotions were adverse employment decisions); Hashimoto v. Dalton, 118 F.3d 671, 674–75 (9th Cir. 1997) (negative job reference was adverse employment decision), cert. denied, 523 U.S. 1122 (1998); Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (transfer of job duties and "undeserved" performance ratings were adverse employment decisions), cert. denied, 498 U.S. 939 (1990); E.E.O.C. v. Crown Zellerbach Corp., 720 F.2d 1008, 1012 (9th Cir. 1983) (four-month disciplinary suspension was adverse employment decision).

In Ray v. Henderson, 217 F.3d 1234 (9th Cir. 2000), the Ninth Circuit held that an "adverse employment action" required for Title VII retaliation claim is adverse treatment that is "reasonably likely" to deter employees from engaging in protected activity.  The court concluded that an employee suffered cognizable adverse employment actions when the employer, in alleged retaliation for the employee's complaints concerning management's treatment of women employees, eliminated employee meetings, eliminated a flexible start-time policy, instituted a workplace "lockdown," and reduced the employee's workload and salary.  The court also concluded that a genuine fact issue existed as to whether the employee was subjected to a retaliation-based hostile work environment, thus precluding summary judgment on his hostile work environment-based retaliation claim.

**TIMELINESS OF THE COMPLAINT**

Defendant argues that plaintiff's termination became final on May 1, 2017, rendering her BOLI complaint untimely with regards to the termination.  To the contrary, the termination should not be deemed final until at least May 18, 2017 -- the end of the grievance process, which was mandatory under the Union contract.  See Exhibit 24 - Bates 106-107 - (5/18/17 decision upholding termination).  The BOLI complaint was filed within 300 days of that decision.

To plaintiff's knowledge, that is a question of first impression in the Ninth Circuit, but the only case law plaintiff's counsel has been able to locate within this Circuit indicates that plaintiff's view is the correct interpretation.  For example, in <u>Nichol v. City of Springfield</u>, Case No. 6:14-cv-01983-AA, this Court noted in its December 3, 2017, opinion (issued before the deadline urged by defendant):

> Plaintiff promptly grieved her termination with Acting Chief Lewis. In a memo dated June 8, 2013, Acting Chief Lewis wrote back to say he had found no basis for altering his termination decision. Plaintiff, through the union, appealed to Grimaldi. In a July 24, 2013 memo from Grimaldi to the president of the Springfield Police Association, Grimaldi denied the grievance and upheld Acting Chief Lewis's termination decision. *The union elected not to arbitrate the termination, rendering Grimaldi's decision final.*

It would not make sense, either as a matter of legal interpretation or of policy, to deem the termination final and start the clock before the exhaustion of grievances and arbitration. One point of Union representation, and the grievance procedures and arbitration that come with that representation, is to obviate the need for judicial intervention. As Judge Papak noted in a similar situation in <u>Or. Natural Desert Ass'n v. McDaniel</u>, 751 F. Supp. 2d 1145, 1150-51 (D. Or. 2010):

> The BLM [Bureau of Land Management] decision initially became final when the IBLA [Interior Board of Land Appeals] failed to issue a timely decision on ONDA's petition for stay. Subsequently, the IBLA merits decision became a final agency action upon issuance and simultaneously rendered the underlying BLM decision non-final for purposes of APA [Administrative Procedures Act] review. To find that the IBLA merits decision and the underlying BLM Decision Record are both final agency actions susceptible to ONDA's challenge in federal court would be deeply counterintuitive. Here, after the IBLA failed to issue a timely ruling on ONDA's petition for stay, ONDA could have

initiated suit in this court for review of the BLM decision. Yet ONDA instead elected to continue to a merits determination with the IBLA, perhaps for strategic reasons. . . . Thus, in this case, the IBLA merits decision is the sole final agency action that ONDA may challenge in this court.

Even regarding the earlier events which are time-barred, those events which occurred prior to the statute of limitations for this lawsuit are admissible as evidence demonstrating the pattern of gender discrimination that was in effect prior to the limitations period relevant to the other claims.  In Lyons v. England, 307 F.3d 1092 (9th Cir. 2002), the Ninth Circuit explained:

> Our inquiry under Morgan does not end with the rejection of appellants' continuing violation argument.  We must consider in addition what relevance appellants' evidence of timebarred discriminatory acts may have to the prosecution of their timely disparate treatment claims.  The Supreme Court instructed in Morgan that
>
>> "The existence of past acts and the employee's prior knowledge of their occurrence . . . does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.  Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim."
>
> Id. at 2072 (emphasis added).  Thus, even if appellants were aware that the appellee had violated their rights through the prior discriminatory assignment of details, their timely failure to-promote claims are not barred. In fact, appellants are permitted to offer evidence of the pre-limitations discriminatory detail assignment scheme in the prosecution of their timely claims.

307 F.2d at 1108.  The court concluded that "a discriminatory act for which the employer's liability is time-barred 'may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue.' [United Air Lines, Inc. v. Evans, 431 U.S. 553,] 558 [(1977)]." Id. at 1110.

## FACTUAL BACKGROUND

### A.    General Overview

The Declaration of Christine Daugherty, incorporated herein, sets forth the general background of her interactions with her supervisors at the Deschutes County Sheriff's Office

over many years, and her direct rebuttal of each of the defendant's factual assertions.

The following factual statements are presented in addition to that declaration, with citations to documents and transcript excerpts submitted herewith as exhibits.

**B.      Plaintiff's History with the Deschutes County Sheriff's Office through 2016 -- Evaluations and Disciplinary Record**

Plaintiff works for the Deschutes County Sheriff's Office, in the Deschutes County Jail, where she has worked as a Corrections Deputy for more than 15 years.  She was discharged in May 2017 for alleged insubordination, and then after arbitration was reinstated.  While Deputy Daugherty had previously been disciplined by the County, she had not previously been disciplined for insubordination, or even verbally counseled regarding that alleged problem. In addition, as discussed immediately *infra*, she almost uniformly was commended by her supervisors over the years for her commitment to following the rules and being a good team player.  As explained further herein, that began to change when she made complaints in 2016 and early 2017 about her supervisors, and they began to see her as a troublemaker.

On the Deschutes County Sheriff's Office evaluation forms there are 18 categories -- Attendance, Operation and Care of Equipment; Adherence to Policies and Procedures, Safety Practices; Integrity; Job Knowledge; Personal Conduct; Judgment and Decisions; Self Initiative; Quality of Work; Customer Service; Teamwork; Contacts with Other Employees; Acceptance of Responsibility; Acceptance of Directions; Effectiveness under Stress; Professionalism; and Officer Safety.  The options for each category are "Not Satisfactory"; "Requires Improvement"; "Meets Standards"; and (except for the first four categories) "Exceeds Standards."

In 2012 (Exhibit 1 attached to Dugan Declaration), Deputy Daugherty's supervisor marked "Meets Standards" for all categories except "Self-Initiative," for which her supervisor

marked "Exceeds Standards."  Exhibit 1 at 1 (Bates 2028). Her supervisor noted that Deputy

Daugherty "works hard and is appreciated by her teammates for her solid work ethic." *Id*. at 2,

Bates 2029.

We do not have an evaluation for 2013.  In 2014 her supervisor marked that Deputy

Daugherty "Meets Standards" for all 18 categories, except "Teamwork," for which the supervisor

marked "Exceeds Standards." Ex. 2 at 1, Bates 2031. Her supervisor noted that Deputy

Daugherty "never backs away from whatever duties may cross her path throughout her shift." *Id*.

at 2, Bates 2032.

In February 2015 Sergeant Gibson completed Deputy Daugherty's evaluation. Ex. 3,

Bates 2036-38. He marked "Meets Standards" for 14 categories. *Id.* at 1, Bates 2036. He marked

"Exceeds Standards" for two categories - Self -Initiative and Officer Safety," noting that Deputy

Daugherty "regularly identifies projects that need completed and handles them" and takes an

"active role" in making sure the facility is clean." *Id*. at 1-2, Bates 2036-37. In an abrupt change

from the previous two evaluations, she received a "Requires Improvement" for "Adherence to

Policies and Procedures" and "Judgment and Decisions," with the explanation (for both) that she

had received a written reprimand for violating policy. *Id*. at 2036-37. Deputy Daugherty

addresses this in her declaration at ¶ 5, noting that she had run a DMV report regarding her own

DMV vehicle, but not for personal gain, and she regretted that lapse in judgment.

In February 2016 Deputy Daugherty's supervisor found that she "Meets Standards" for 16

categories. Exhibit 4, Bates 2039. He found that she "Exceeds Standards" for Self-Initiative,

noting that she provided "exceptional customer service when dealing with the public, fellow

employees and inmate population" and "constantly strives to maintain a safe and clean working

environment." *Id*. at 1-2, Bates 2039-40. Regarding "Judgment and Decisions" her supervisor

marked that she "Requires Improvement," with the explanation that she had been disciplined during 2015 for violating policy regarding a Telmate inmate video. *Id*. Deputy Daugherty explains in her Declaration ¶ 6, "another Deputy was viewing a visitation video, and I happened to recognize the female as being my nephew's wife. I told my nephew about the content on the video. I did this to protect the children involved. I did not receive any monetary gain for providing this information."

**C.     2016 and January 2017 - Deputy Daugherty Complains about Her Supervisors**

In 2016, Deputy Daugherty began to experience what she perceived to be harassment by her supervisors, Lieutenant Van der Zwiep and Sergeants Steward and Marsh, and she complained in writing about this in 2016 and in January 2017.  Daugherty Decl. ¶¶ 12 and 13. She states in her declaration that she "filled out three peer review sheets on all three of my supervisors in 2016 (Lieut. Van der Zwiep, and Sergeants Steward and Marsh). I listed my complaints and harassment issues. No one ever got back to me regarding my review sheets. I again filled out three peer view sheets on January 20, 2017, at the MAC Center. All three were regarding my supervisors (Lieut. Van der Zwiep and Sgts Steward and Marsh). No one ever got back to me regarding my review sheets."

Although unfortunately she did not keep copies of these written complaints, she reiterated these complaints in June 2017. Exhibit 7. One was about Van der Zwiep telling her, "I know all about you and if I could I'd put you out to pasture."

Van der Zwiep testified that he knew she had made complaints about him. Ex. 32 at 28:12-23.  He also testified that Lieut. Van der Zwiep and sergeants had told him that Daugherty had a bad attitude. *Id*. at 44:18-24.

After she was terminated, she was finally contacted about the negative feedback she had

provided in writing about her supervisors in January 2017. Daugherty Decl. ¶ 30. She has

repeatedly requested a copy of the investigation but has been repeatedly denied. *Id*. ¶¶ 31-32. At

the time she was reinstated, to her knowledge the investigation was still pending. *Id*. ¶¶ 33-34.

She was therefore very surprised to be placed under the supervision of Sergeant Steward.

### D.    2017 Evaluation

In January 2017, Sergeant Steward evaluated Deputy Daugherty, and found that she

"Meets Standards" for 13 of the 18 categories, but was "Not Satisfactory" for two categories

(Judgment and Decisions; and Quality of Work), and "Requires Improvement" for three

categories (Customer Service; Teamwork; Acceptance of Responsibility). Ex. 5 at 1, Bates 2044.

Nonetheless he hand-wrote next to the "Quality of Work" mark "strong work ethics, self

motivated." *Id*. He repeated that praise in the explanation portion, and added that she was "on

time and ready to work each day." *Id*. at 2, Bates 2045. He also noted she had been commended

for her "kindness" and "honesty." *Id*. In the section to explain the negative ratings, her supervisor

stated that she had received verbal counseling several times in the prior year and had been

disciplined once, for "maintaining professional standards" and "decision making," adding that

"*until recently*, Daugherty has not taken responsibility for her actions and not made necessary

changes to improve her work performance." *Id*. (emph. added).

The primary 2016 incident involved an inmate who was found to have a white substance

in her vagina, with Deputy Daugherty being accused of not reporting it.  That was flatly untrue.

As clearly noted in Ex. 8 at 2 (Bates 995), she informed Sergeant Steward of the white substance

at 1:45 pm, after having already informed several deputies, as soon as she noticed, between 1:18

and 1:28 pm.  Exhibit 9 (Bates 985), the IA for this incident, indicates the beginning of a pattern

by her supervisors, of setting up a paper trail to try to get her disciplined or fired.  At page 7 (Bates 991), several "verbals" are listed, even though those are not supposed to be considered in determining progressive discipline, and in fact are supposed to be "cleaned out" at the end of each year.  Exhibit 28 (Steward depo. tr.) at 28:2-11; Exhibit 32, Van der Zwiep Tr 14:6-12.

An August 2016 incident actually involved Ms. Daugherty enforcing the rules, requiring inmates to make their beds rather than watch television, leading to another verbal reprimand.  Ex. 28, Steward Tr 19:21 to 20:14.  Indeed, Lieut. Van der Zwiep accused her of "lack of discretion," by which he explained he meant she was strict in imposing the rules on the inmates. Ex. 32, 48:9 to 49:11.

### E.      The 2017 Internal Affairs Process

The 2017 Internal Affairs investigation of Deputy Daugherty, which led to her termination, addressed two incidents on February 17, 2017 (one in the early morning and one in the afternoon), and one in March 2017.  The IA investigation concluded that Daugherty had been insubordinate and Sheriff Nelson terminated her employment.

The Internal Affairs Report leading to the termination of Deputy Daugherty again improperly listed and considered verbal counseling (Exhibit 21 at 11, Bates 1363), which, as noted above, is not supposed to be counted as prior discipline when applying progressive discipline.

In addition, nothing in Deputy Daugherty's disciplinary record prior to her termination, nor her evaluations, mention any issues with insubordination or failing to follow instructions. Therefore (as the arbitrator found) termination was improper under the union rules, because any prior discipline (even if property considered as discipline) was for different types of behaviors.

Furthermore, Deputy Daugherty was not told at the time of the February 17, 2017, issues that she was being insubordinate, and it was not until after the March 2017 incident that she was informed she was being accused of insubordination.  As Lieutenant Jernigan explained to Sheriff Nelson *before* he terminated Deputy Daugherty:

> The conversation was initiated by Daugherty, who mentioned in passing that she understood I was not happy with her. At this time I felt obligated to briefly express my disappointment with Daugherty regarding her behavior and lack of being a team player. I also informed her I forwarded this information to her supervisor regarding the incident. At no time, did I consider this verbal counsel. I did not document our conversation as verbal counsel as well, this was a brief conversation in passing initiated by Deputy Daugherty. My expectation was that this incident be reviewed further and the proper course of action take place, as I had learned that multiple other incidents may have taken place on this same date.  Daugherty was polite and respectful during our conversation and apologized for her actions.

Ex. 22, Bates 101575.

That said, the IA investigation leading to Deputy Daugherty's termination was tainted by the fact that the only witness interviews that were done were conducted by Lieutenant Jernigan, who acknowledged that he had to recuse himself because he was a participant and witness to the incident being investigated.  *See* Dugan Decl. ¶¶ 6-9; Ex. 13 and 14 - Bates 84 and 85 - Jernigan's summary of his involvement in 2/17 pm incident and confirmation thereof; Ex. 11, Bates 1116 (Jernigan is a witness, holding inmate's legs); Ex. 17, Bates 1111 (Jernigan interviewed Gibson about the 2/17/17 p.m. incident); Ex. 15, Bates 1103 (Union representative notes the conflict and Jernigan stops the interview); Ex. 16 at 3 - Bates 1107 (Jernigan resumes the interview a few minutes later and interviews Daugherty about the issue to which he was a witness and complainant); Exhibit 17; Ex. 19 at 2 and 6, Bates 1087 and 1091 (Jernigan presents his findings to the Captain; states that "Sergeant Gibson was questioned by a lieutenant" -- that was Jernigan).  On April 2, 2017, Lieut. Jernigan presented his findings to Captain McMaster in

a memo, including his findings regarding the events of the afternoon of February 17, 2017, with which he was involved. Exhibit 19 (Bates 1086-96).

Although Lieut. Lutz was supposed to be conducting that part of the investigation, Lieut. Jernigan emailed Lieut. Lutz, "We need to talk. I need to gauge my findings." Exhibit 20 (Bates 101473).  Lutz interviewed no witnesses, and Nelson does not recall the steps he took to make his decision to terminate Daugherty; and he testified he does not recall reviewing any video or interviewing any witnesses.  Exhibit 29, Nelson Tr 14:11 to 16:20.

As for the incidents themselves, they were blown ridiculously out of proportion.  The first incident involved a five minute period when Deputy Daugherty was trying to quickly get the area broom-clean in preparation for FBI agents' arrival, and did not disobey any direct order.  *See* Daugherty Decl. ¶¶ 17-22; *see also* Ex. 10 (Bates 1115) (transcript of video of incident) (Daugherty explains they haven't brought in anyone to help her clean; Sgt Marsh says "Okay, do it quickly"; after that it is about two minutes before she begins processing the release). Four days earlier the Sheriff had given a training where he emphasized the importance of working together to keep the areas clean and tidy.

As for the incident that afternoon, again the situation was dramatically overblown in the IA investigation.  Deputy Daugherty explains what happened in the incident that afternoon at Daugherty Decl. ¶¶ 23-26.  *See also* Ex. 11 - Bates 1116 (video transcript); Ex. 17 - Bates 1111 (Jernigan interviews Sgt Gibson; at page 2, Bates 1112, Gibson confirms that no order was given to Daugherty; at page 3m Bates 1113, Gibson is on the fence regarding whether she violated policy); Ex. 18 , Bates 1242 (Daugherty explains "I was assigned to booking alone. I asked

Sergeant Marsh if he was going to assign someone else. He said, "No. And then he said, "I'm your second." Lutz: "Ok, so to clarify, you were the only Deputy assigned to Booking and your Sergeant was your assistant or your partner for the day." Daugherty: "Correct." Lutz: "Why was this?" Daugherty: "I don't think we had staffing, I guess. I don't know."). Gibson was the transport sergeant that day. Exhibit 30, Gibson Tr. 15:20-22. As such, he had a transport team available to him. *Id*. 15:23 to 16:5. It did not have to have a female deputy. *Id*. 16:6-10. That said, female deputy Gaspard was already helping the female inmate, and already had information about the situation, as explained by Daugherty in her Declaration; *see also* Gibson Tr. 17:22 to 18:6.

The March incident is explained in Daugherty's Declaration paragraphs 28-29, and is similarly a molehill that was made into a mountain. *See also* Ex. 14 - Bates 85 (by the time Daugherty got to the room, "the task had mostly been completed," confirming Daugherty's understanding that the three staff were enough to handle it.)

Even given the flaws in the investigation, Lieut. Jernigan recommended only four days suspension (Ex. 19 at 11 - Bates 1096) and Lieut. Lutz recommended only 12 days suspension, a last chance agreement, and a work plan (Ex. 21 at 13 - Bates 1365). Sheriff Nelson's decision to terminate Deputy Daugherty was extraordinary and unwarranted.

F.    **The Sheriff's Office Discloses Daugherty's Confidential Personnel Information to the Bend Bulletin**

In early June 2017, the Bend Bulletin published a story about Daugherty and another Deputy, titled "Fired sheriff's deputies engaged in unacceptable behavior -- Their actions included falsifying records, sleeping on the job." Exhibit 27, attached to Daugherty Decl. Sheriff Nelson spoke to the Bulletin about Daugherty. The article stated:

In interviews with internal investigators, both Daugherty and Chambers said they'd had difficulty adapting to a more rigorous enforcement of department policy instituted by Sheriff Shane Nelson. Daugherty had been with the jail for 12 years before her dismissal, Chambers for 18.

Nelson said he couldn't speak to Daugherty and Chambers' perceptions of how department policy had been enforced in the past, adding their conduct was unacceptable, and that their past conduct also factored into his decision to terminate their employment.

"I have an expectation of the people I work with. I expect them to be in line with our mission and values, and I expect them to make good decisions," he said. "It's the only way we can deliver superior public safety and services to our citizens."

The article also makes clear that the Bulletin was provided with Daugherty's personnel file, as it cites the internal affairs report at length, including references to allegations going back to 2006. Exhibit 27 at 2-3.

No statement was issued to the media about Daugherty's reinstatement. As a result, the media continued to add her name and firing information to subsequent articles about the Sheriff's Office.

**G.    Daugherty's Treatment After Being Reinstated**

As noted above, after being reinstated, plaintiff was very disturbed and surprised to find that Sergeant Steward was her supervisor, since to her knowledge her complaints about him were still under investigation.  Daugherty Decl. ¶¶ 33-34.

As she explains in the remainder of her Declaration, she experienced the following negative treatment after her reinstatement:

- After reinstatement she did not receive my full back pay for many months; she won her arbitration November 29, 2017, but did not receive her back pay until March 2018. Not receiving the back pay was a hardship on me, as she explains in her Declaration.

- She did not receive any of the uniform items she had prior to being fired, and it took over a year to get everything back, with Daugherty having to justify to her Captain why she required a jacket and Class A hat.

- She was not given back her Jail ID Number.

- She was threatened with being put on a probation performance improvement plan.

- She became the only female on her team with 15 male officers, and is therefore responsible for training new female deputies how to conduct a pat down/search, unclothed search and body scan search. This is exacerbated by the fact that the number of jail beds for female inmates has increased, with no corresponding increase in female staff. Ex. 31, Jernigan Tr. 9:15 to 11:2; Ex. 32, Van der Zwiep Tr 59:8-20.

- Despite that training duty (beyond her normal duties), she gets no additional pay; whereas male staff get additional "PTO pay" when they do trainings for other staff.  She has applied twice to become a PTO, with Lieut. Van der Zwiep both times denying her, saying "You'll never be a PTO as long as I work here."

- She is required to pat down male inmates, conduct hourly rounds, and conduct clothing exchange, even if male inmates are in the shower or on the toilet, leading to male inmates exposing themselves to her, with Lt Van der Zwiep saying, "It's just the nature of the beast." No discipline was imposed on the inmates for their actions.

- Sgt Steward told Daugherty "Don't argue with teammates, don't throw teammates under the bus like you did to Barin [the female deputy who was filing her nails during the March 2017 cuff check] and do what you're told without question," and continued to berate her, as explained in her Declaration.

- Sgt Steward accused Daugherty of saying "something sexual in nature" about singer Carrie Underwood, and he sent it up the chain of command for investigation, which lasted two months and was deemed unfounded. Besides Daugherty Decl., *see* Ex. 28, Steward Tr 39:13 to 43:13.

- Almost simultaneously with Sgt Steward submitting that unfounded complaint about Daugherty, Steward and Sgt Turpen, Deputy Briggs, and Deputy Reddick were laughing while training on the body scanner, in Daugherty's presence, with an image of a male in uniform, with his baton coming up from his groin area.

- On another occasion, Steward told her no one could help her in booking, while she observed him and Sgt Smith watching off-road bike trail videos on the internet.

- November 4, 2019, Lt Van der Zwiep said, "Policy states you can do opposite sex scans now." The next day, on night shift, Deputy Quinn and Sgt Steward were in booking, and Daugherty was busy trying to dress down three females for housing, which Deputy Quinn thought was taking too long, so Daugherty told him, "You can scan them. . . . It's ok per policy." Sgt Steward said, "No, only same sex. I don't care what policy says." Steward then wrote Daugherty a memo chastising her for raising questions about the body scan policy, saying " In the future, if you disagree with my direction, it is more appropriate to approach me in a private setting rather than in front of other staff."  Exhibit 25. A few days later, Lt McGowan re-confirmed that policy now allows opposite sex scans.

- Repeatedly in 2019, Sgt Steward denied Daugherty's requests for time off, with no explanation.  Exhibit 26.

Demonstrating a dramatic change, when a different supervisor (Turpen) conducted Daugherty's January 2019 evaluation, he found that Deputy Daugherty "Meets Standards" for all

18 categories, commenting that "Deputy Daugherty takes pride in her work space and the job task at hand. Deputy Daugherty is a self starter and manages her time with little supervision." Ex. 6.

### H.    Evidence of Age Discrimination

Plaintiff is 55.  When Deputy Daugherty was terminated, younger deputies were retained, while some older deputies were also terminated.  Daugherty Decl. ¶ 48.  Given Lieut. Van der Zwiep's statement that he wanted to "put her out to pasture," she has felt an animus towards her as an older worker.  *Id*.

## ARGUMENT

## PLAINTIFF HAS PRESENTED A PRIMA FACIE CASE OF GENDER DISCRIMINATION SUFFICIENT TO SURVIVE SUMMARY JUDGMENT

As set forth in the factual background, Ms. Daugherty has for the past several years been treated differently from her coworkers, singled out for internal affairs investigations, chastised, denied privileges and leniency afforded to male coworkers, required to perform duties above and beyond those performed by men, and treated disparately in many other ways, as explained in Ms. Daugherty's declaration and in the summary herein.  A reasonable jury could find that she has been the victim of gender discrimination.  As explained at the beginning of this brief, the termination was final on May 18, 2017, and the BOLI complaint was filed within the 300-day federal statutory period.  Even if the Court disagrees and finds that the termination was final earlier than that, the supervisors' disparate treatment of Deputy Daugherty after her reinstatement is sufficient for a reasonable jury to find adverse employment action occurred.

Defendant argues that plaintiff cannot show that she was performing her job in a satisfactory manner, but there is abundant evidence that defendant progressively exaggerated minor issues; never told plaintiff she was being insubordinate (and a reasonable jury could find

she was not); first disciplined her for being too strict in enforcing the rules; and then tried to argue she was not following the rules; all of this after more than a decade of satisfactory performance of her duties, with high marks and repeated positive comments on her evaluations. A reasonable jury could find that the allegations that she was failing on the job were pretextual and overstated, and do not overcome the evidence that defendant chose to single her out for discipline after deciding she was uppity and a troublemaker.

Plaintiff has presented sufficient evidence for a reasonable jury to find that her gender was the sole reason, or a motivating factor, in the defendant's decision to terminate her, and/or in the manner in which she was treated after her reinstatement. *See* Costa v. Desert Palace, Inc., 299 F.3d 838, 856-57 (9th Cir. 2002) (*en banc*), *aff'd*, 539 U.S. 90 (2003).

## PLAINTIFF HAS PRESENTED A PRIMA FACIE CASE OF AGE DISCRIMINATION SUFFICIENT TO SURVIVE SUMMARY JUDGMENT

Plaintiff is over 40, and has presented sufficient evidence for a reasonable jury to find that but for her age, she would not have been "put out to pasture" by the defendant. *See* Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) (comparing *prima facie* test for ADEA and Title VII).

## PLAINTIFF HAS PRESENTED A PRIMA FACIE CASE OF WHISTLEBLOWER RETALIATION SUFFICIENT TO SURVIVE SUMMARY JUDGMENT

Plaintiff's lawsuit is based upon O.R.S. 659A.203(b), which provides that it is an unlawful employment action for a public employer to:

Prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:

(A). A violation of any federal, state or local law, rule or regulation by the public or nonprofit employer;

(B). Mismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the public or nonprofit employer.

The whistleblower statute requires only a subjective, good faith belief by the employee that she is reporting a violation of law, rule, or regulation.  Neighorn v. Quest Health Care, 870 Fed. Supp. 2d 1069, 1102 (D. Or. 2012); Hall v. State of Oregon, 274 Or. App. 445, 366 P.3d 345 (2015).  In Brunozzi v. Cable Communications, Inc., 851 F.3d 990 (9th Cir. 2017), the Ninth Circuit held that such claims include internal reports as well as external reports.

As explained in the factual background, plaintiff has presented a *prima facie* case that before she was fired, she twice reported on wrongdoing by her supervisors; and shortly after being fired she learned that her complaints were being investigated. It was not until then, in early June 2017, that she became aware that an investigation was underway regarding her pre-termination complaints, about management and at that time she was first put on notice that her discharge may have been triggered at least in part by her whistleblowing activity.  She sent a tort claim notice on this whistleblower claim November 28, 2017, within the 180-day statutory period for doing so.

## CONCLUSION

Based on this brief and the Declarations and exhibits accompanying this brief, plaintiff respectfully requests that the Court deny defendant's motion for summary judgment.

DATED October 21, 2020.

Respectfully submitted,

/s/ Marianne Dugan
Marianne Dugan, Oregon State Bar # 932563
1430 Willamette St. # 359
Eugene, OR 97401
Attorney for Plaintiffs